# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE FORUM MOBILE, INC.      )      C.A. No. 2020-0346-JTL

## MEMORANDUM OPINION

Date Submitted: February 26, 2021
Date Decided: March 18, 2021

Jeremy D. Anderson, FISH & RICHARDSON P.C., Wilmington, Delaware; *Attorney for Petitioner.*

**LASTER, V.C.**

Petitioner Synergy Management Group LLC seeks the appointment of its President, Benjamin Berry, as custodian of Forum Mobile, Inc. under Section 226(a)(3) of the Delaware General Corporation Law (the "DGCL"). The respondent technically is Forum, but Forum is a defunct entity whose only value lies in the fact that its shares continue to have a CUSIP number that allows them to trade over the counter.[1] Synergy seeks to revive Forum to use as a blank check company. Through a reverse merger with Forum, a new business can access the public markets.

Because Forum is defunct, the petition is unopposed. The petition nevertheless presents significant issues of Delaware public policy. Accordingly, the court will appoint an amicus curiae to consult with the United States Securities and Exchange Commission (the "SEC") regarding the petition and to provide an independent view regarding whether the petition should be granted.

## I.      FACTUAL BACKGROUND

The facts are drawn from Synergy's petition and from the documents it incorporates by reference.

---

[1] "CUSIP stands for Committee on Uniform Securities Identification Procedures. A CUSIP number identifies most securities, including: stocks of all registered U.S. and Canadian companies, and U.S. government and municipal bonds. The CUSIP system ... facilitates the clearing and settlement process of securities. The number consists of nine characters ... that uniquely identify a company or issuer and the type of security." U .S. Securities and Exchange Commission, CUSIP Number (Jan. 31, 2006), http://www.sec.gov/answers/cusip.htm.

## A.    The Parties

Forum was incorporated in the State of Delaware on June 21, 1995. Pet ¶ 4. It obtained a public listing, but it has failed to maintain current, publicly available information about itself and its operations as required by the federal securities laws. *Id.* ¶ 6. Forum's shares continue to trade on the over-the-counter quotation board, otherwise known as the "pink sheets," under the symbol "FRMB." *Id.* ¶ 6. A quick internet search reveals recent prices in the neighborhood of two cents per share.

In addition to not complying with the federal securities laws, Forum has failed to comply with Delaware law. It does not maintain a registered agent within the State of Delaware, has not filed annual reports with the Delaware Secretary of State, and has not held an annual meeting of stockholders. *Id.* ¶ 15; Berry Decl. Ex. 3; *see* 8 *Del. C.* §§ 131, 211, 502. The Delaware Secretary of State's website lists Forum's status as void for failing to pay its franchise taxes. Pet. ¶ 4; Berry Decl. Ex. 2. Forum appears to have abandoned its business. Pet. ¶ 7.

Synergy has attempted to locate Forum's officers and directors to demand that they cause Forum to comply with its legal obligations. *Id.* ¶¶ 16–18. Synergy has received no response. *Id.* ¶ 19.

Despite Forum's status as a defunct entity, the fact that its shares have a CUSIP number and trade over the counter gives the company value. Recognizing this fact, Synergy acquired 494,530 shares of its stock. Synergy is a firm that specializes in "creative corporate funding solutions." *Id.* ¶ 10. Berry is Synergy's President. Berry Decl. ¶ 1.

Through this litigation, Synergy seeks to have Berry appointed as a custodian. Once appointed, Berry intends to "identify private companies that may be interested in a reverse merger" with Forum. Pet. ¶ 30. Synergy maintains that "[t]he value of the stockholders' equity in [Forum] will increase if and when a private company brings a new and viable business to [Forum]." *Id.* That doubtless is true. In essence, Berry and Synergy plan to use Forum as a blank check company.

## B. This Litigation

Synergy filed this petition on May 8, 2020. Synergy's petition is one of six virtually identical petitions that Synergy has filed.[2] Synergy's counsel also represents Universal Management Association, which has filed four virtually identical petitions seeking to have its president appointed as a custodian for other defunct Delaware corporations.[3]

## II. LEGAL ANALYSIS

Synergy seeks an order appointing Berry as custodian of Forum, granting Berry the power to call a meeting of stockholders, and authorizing the meeting to proceed under a special quorum requirement so that the stockholders who attend the meeting can elect a new board of directors. Berry then will revive Forum for use as a blank check entity.

---

[2] *See In re Avistar Commc'ns Corp.*, C.A. No. 2020-0554-JTL; *In re Indiepub Ent., Inc.*, C.A. No. 2020-0549-JTL; *In re Int'l Card Establishment, Inc.*, C.A. No. 2020-0550-JTL, *In re AVP, Inc.*, C.A. No. 2020-0551-JTL; *In re Columbia Energy Res., Inc.*, C.A. No. 2020-0642-JTL; *In re Solar Energy Initiatives*, *Inc.*, C.A. No. 2020-1030-JTL.

[3] *See In re Majic Wheels Corp.*, C.A. No. 2020-0579-JTL; *In re Pick-Ups Plus, Inc.*, C.A. No. 2020-0602-JTL; *In re Infosearch Media, Inc.*, C.A. No. 2020-0646-JTL; *In re Mansfelder Metals, Ltd.*, C.A. No. 2020-0779-JTL.

Synergy's petition implicates important questions of public policy, including the State of Delaware's interest in preventing the use of Delaware entities to circumvent the federal securities laws.

## A.    Applicable Precedent

Synergy's request is the latest instance of a recurring phenomenon. This court periodically confronts efforts by capital-markets entrepreneurs to revive otherwise defunct entities to use as blank check companies. The court initially addressed this practice in 2002. *See Clabault v. Caribbean Select, Inc.*, 805 A.2d 913 (Del. Ch. 2002), *aff'd*, 846 A.2d 237 (Del. 2003) (ORDER). Six years later, the court addressed the issue again. *See Klamka v. OneSource Techs., Inc.*, 2008 WL 5330541 (Del. Ch. Dec. 15, 2008). A few years later, the issue resurfaced for a third time. *See In re Native American Energy Gp., Inc.*, 2011 WL 1900142 (Del. Ch. May 19, 2011); *see also Williams v. Calypso Wireless, Inc.*, 2012 WL 424880 (Del. Ch. Feb. 8, 2012). Synergy's petition is the fourth trip to the well.

The seminal decision is *Clabault.* One of the petitioners in that case, Stirling Corporate Services, LLC, was "in the business of identifying bankrupt, voided corporations that were once publicly traded and, then, reviving and restructuring them into saleable public shells." *Clabault*, 805 A.2d at 915. Stirling pointed out that "[s]tockholders of the public shell, whose stock was worthless before the merger, might realize a small benefit," but the court observed that their gain was "a decidedly secondary consideration." *Id.* The real action was in the reverse merger, where the private company "paid Stirling a substantial fee." *Id.* at 916.

In *Clabault*, Stirling petitioned the court to order the holding of an annual meeting under Section 211(c) of the DGCL and to authorize the use of the special quorum requirement contemplated by that statute, under which those stockholders present at the meeting constitute a quorum. *Id.* at 914–15. Vice Chancellor Lamb agreed that the plaintiffs had made out a *prima facie* case under Section 211(c), but he nevertheless declined to grant the requested relief. He explained that "Stirling's petition is part of a plan to make an 'end run' around the federal rules and regulations governing the public trading of securities," thereby avoiding "the burden or expense of complying with SEC disclosure requirements, in particular the need to file the necessary registration statement." *Id.* at 915.

> Caribbean is a bankrupt corporation that has not engaged in any business operations in over a decade. It has no assets or stockholders equity. Its certificate of incorporation was voided years ago by the Delaware Secretary of State for non-payment of franchise taxes. In the usual course of business, the directors of Caribbean should have filed a certificate of dissolution terminating its corporate existence and a deregistration statement terminating its status as a reporting company. And, had they done either of those things, Stirling would be unable to proceed with the reverse merger plan . . . .

*Id.* at 918. Because Stirling planned to use the entity to effect a reverse merger and bypass the requirements for an initial public offering, Vice Chancellor Lamb held that "it would be an abuse of discretion to permit Stirling to employ the powers of this court to achieve its questionable ends." *Id.* at 915. "[U]nwilling to use its powers to assist Stirling to profit by the sale of regulatory avoidance," the court denied the petition's requested relief. *Id.* at 918.

Six years after *Clabault*, Vice Chancellor Noble denied a petition nearly identical to Synergy's. *Klamka*, 2008 WL 5330541. Like Synergy, the petitioner sought the

appointment of a custodian for a defunct entity under Section 226(a)(3) of the DGCL. The petitioner argued that the defunct entity's business operations could not be revived and that "any potential value from rousing the corporation can be found only in its listed stock symbol and open account with Pink Sheets." *Id.* at *1. Like Synergy, the petitioner sought to take over the defunct entity because to do so "would require less time and expense than forming a new venture, which would need both a new incorporation effort and a new application and registration process." *Id.*

As in *Clabault*, Vice Chancellor Noble agreed that the petitioner had set out a *prima facie* case for relief, but he declined to grant the petition. *See id.* at *1–2. He noted that the petition involved a "different procedural mechanism" than *Clabault*, but otherwise implicated the same policy issues by seeking to use Delaware law "to assist in the avoidance of the normal order and process of federal securities regulation." *Id.* at *1 (citing *Clabault*, 805 A.2d at 915). Vice Chancellor Noble concluded that the petitioner had "shown no useful purpose for the revival of OneSource; his objective can be easily and properly . . . accomplished through new corporate and other appropriate filings. Indeed, he appears to view OneSource as a vehicle of convenience." *Id.* at *2.

In reaching this conclusion, Vice Chancellor Noble credited that the petitioner did not harbor "fraudulent, or otherwise improper, motives for pursuing the proposed [regulatory] 'short cut,'" but he nevertheless denied the motion. *Id.*

> The potential for untoward results—such as might flow from Klamka's avowed intention to avoid the regular Pink Sheet initial process—when coupled with the absence of any apparent . . . purpose other than simply taking advantage of an existing corporate form, a trading symbol, and a Pink Sheet's [sic] listing, persuades the Court that its discretion would not fairly

and properly be exercised if it were to appoint a custodian in these circumstances.

*Id.* The court emphasized that use of the "ordinary procedures to establish a business entity is preferable to reviving an essentially defunct entity without any objectively useful business purpose." *Id.* Synergy's petition fails to cite *Klamka*.

Three years after *Klamka*, the court confronted the same set of policy considerations in *Native American Energy*. The parties in the case had attempted to use a reverse merger with an otherwise defunct entity to access the public markets, but had committed an error in the process that resulted in the issuance of invalid shares. *Native Am. Energy*, 2011 WL 1900142, at *1–3. The company's board of directors and its stockholders approved a resolution providing that the invalid shares would "be recognized as freely transferable shares of the Company's outstanding Common Stock." *Id.* at *3–4 (internal quotation marks omitted). Recognizing that those steps would be ineffective standing alone, the company sought a judicial declaration that the shares were valid. *Id.* at *4. The court dismissed the action, holding that it "lack[ed] jurisdiction to render what would be an advisory opinion." *Id.* at *7. In reaching this conclusion, the court observed that

> in determining whether to award relief in the present procedural posture, this Court of Equity can take into account New Energy Group's efforts to access the public markets without an initial public offering. Delaware has no interest in facilitating reverse mergers with defunct but still publicly registered shell corporations as a means to circumvent the regulatory protections provided by the federal securities laws. The individuals who control New Energy Group could accomplish their objective easily and properly through new corporate and other appropriate filings.

*Id.* at *7 (alteration, citations, and internal quotation marks omitted).

Summarizing these precedents in a later decision, the court observed that "using a defunct Delaware corporation that happens to retain a public listing to evade the regulatory regime established by the federal securities laws is contrary to Delaware public policy." *Calypso Wireless*, 2012 WL 424880, at *1 n.1. The *Calypso Wireless* decision also cited a case in which this court revoked the charter of a defunct but still registered Delaware shell corporation once its counsel conceded that the "entity had no business purpose other than its potential use as a vehicle to access the public markets and bypass the traditional public registration process." *Id.* at *7 n.3 (citing *AJW P'rs, LLC v. Cirillo*, C.A. No. 4063-VCL (Del. Ch. Oct. 31, 2011) (ORDER)).

Synergy's petition does not deal forthrightly with these authorities. Synergy cites *Clabault*, but conspicuously omits any reference to *Klamka*, *Native American Energy*, or *Calypso Wireless*. Synergy maintains that *Clabault* is distinguishable from the petition in this case due to the "procedural differences" between Section 211(c) and Section 226(a)(3). Pet. ¶ 33. That distinction obviously does not apply to *Klamka*, which involved a petition under Section 226(a)(3). That distinction also ignores the reality that what is at issue are broader policy questions involving Delaware law's interactions with the federal regulatory regime, not procedural niceties.

Synergy also tries to distinguish *Clabault* on the grounds that "Petitioner has never been notified by the [New York Stock Exchange] or any other exchange that its process for gaining control of the board is 'unacceptable.'" *Id.* That issue arose in *Clabault* because the petitioner there—Stirling—previously accessed the public markets using defunct entities by following a route that ran through the New York Stock Exchange. After the

Exchange shut down that route, the petitioner turned to the Delaware courts in search of another trail. The *Clabault* decision did not turn on the Exchange's prior action, but rather the policy implications of the potential Delaware bypass.

Synergy further argues that it "is not attempting and has never attempted to evade federal securities laws." *Id.* ¶ 34 (internal quotation marks omitted). The petitioners in *Clabault*, *Klamka*, and *Native American Energy* could have made the same claim. Those petitioners were trying to take advantage of a regulatory short-cut that each believed was permissible. In each case, a Delaware court held otherwise.

Synergy also asserts that this court's concern about efforts to circumvent the registration and disclosure requirements of the federal securities laws "was more than seventeen years ago." *Id.* ¶ 35. Synergy argues that the "SEC does not prohibit reverse mergers" and "issued an Investor Bulletin in 2011 that alerts investors of the risks of investing in reverse merger companies." *Id.*

Synergy's timing argument is undercut by its failure to cite *Klamka* (2008), *Native American Energy* (2011), or *Calypso Wireless* (2012), which were issued in the ten years after *Clabault* and reduce the time lag from seventeen years (as of 2020) to nine (as of 2021). Synergy's reliance on the Investor Bulletin in 2011 ignores the fact that in *Native American Energy*, issued the same year, and in *Calypso Wireless*, issued the following year, the court reaffirmed its policy against helping capital-markets entrepreneurs use defunct Delaware entities as blank check companies.

Synergy also references three cases in which this court granted similarly unopposed petitions. *See id.* ¶ 14. As Chancellor Allen observed, "unless a deliberated opinion is

produced along with a signed order, this Court will rarely give such orders much precedential weight." *In re La.-Pac. Corp. Deriv. Litig.*, 705 A.2d 238, 240 (Del. Ch. 1997).

> In the press of work, a busy trial judge inevitably relies upon the work of members of the bar. This reliance is backed up in most other instances by the powerful engine of the advocacy system. Other trained lawyers, with professional duties and economic incentives designed to check the work of adversaries will supply the court with a balanced view.

*Id.* at 240 n.1. When a request is unopposed, the checks inherent in the adversarial system do not operate.

In the proceedings that led to the *Clabault* decision, a similar issue arose. Vice Chancellor Lamb noted that when he raised a question about the petition, counsel told him that

> one of the other members of this court had recently signed exactly the same type of order without a hearing and urged that as precedent. I told him that I would not sign the order without a better understanding of the regulatory issues involved and that the other member of the court had done so only because he assumed from the manner in which the application was presented that the issues were routine.

*Clabault v. Caribbean Select, Inc.*, 2003 WL 22038362, at *2 (Del. Ch. Aug. 28, 2003). Vice Chancellor Lamb instead ordered a hearing, and he ultimately denied the petitioner's request for relief. *Clabault*, 805 A.2d at 918.

As in *Clabault*, and for the reasons explained by Chancellor Allen in *Louisiana-Pacific*, the fact that the petitioner obtained three unopposed orders is not persuasive. That outcome is particularly unpersuasive because counsel's petitions only cite *Clabault.*

Counsel fails to cite three other pertinent precedents, including *Klamka*, which is the most analogous case.

**B.     The Need For An Amicus Curiae**

The Delaware authorities addressing efforts to revive defunct entities for use as blank check companies reflect a consistent Delaware public policy against allowing capital-markets entrepreneurs to deploy Delaware law to bypass the federal securities laws that govern stock offerings. That policy is based on this court's understanding of the federal securities laws and the SEC's priorities. In *Calypso Wireless*, this court appointed a receiver to consult with the SEC and determine "whether steps should be taken to halt public trading in Calypso's shares." *Calypso Wireless*, 2012 WL 424880, at *7. Although a receiver is not warranted here, it will be helpful to have input from the SEC and the benefit of adversarial briefing on the petition. That is particularly true because Synergy and another firm have filed a raft of these petitions. Having input from the SEC also will provide a direct answer to the question of whether Delaware's concern about creating a state-law bypass around the federal securities laws governing stock offerings has become stale, as Synergy argues.

A trial court has inherent authority to appoint special counsel to serve as *amicus curiae*. 3B C.J.S. *Amicus Curiae* § 3 ("An *amicus curiae* may be appointed by the court *sua sponte* or may appear by leave of the court. . . . Courts have inherent authority to appoint an amicus even in the absence of a rule or statute." (footnotes omitted)); *see, e.g.*, *Smith v. Chrysler Fin. Co., L.L.C.*, 2003 WL 328719, at *8 (D.N.J. Jan. 15, 2003) ("District courts have inherent authority to appoint or deny *amici* . . . ."); *Martinez v.*

*Capital Cities/ABC–WPVI*, 909 F. Supp. 283, 286 (E.D. Pa. 1995) ("A district court has inherent authority to appoint *amicus curiae* to assist in a proceeding."); *Resort Timeshare Resales, Inc. v. Stuart*, 764 F. Supp. 1495, 1500–01 (S.D. Fla. 1991) ("The district court . . . has the inherent authority to appoint *amici curiae*, or 'friends of the court,' to assist it in a proceeding." (footnote omitted)). The Delaware Supreme Court and this court have appointed *amicus curiae* on several occasions. *See, e.g.*, *In re Appeal of Infotechnology, Inc.*, 582 A.2d 215, 218 n.1 (Del. 1990) (describing appointment of counsel to serve as the Court's "*amicus curiae* to present an independent position"); *Pollock v. Peterson*, 271 A.2d 45, 50 (Del. Ch. 1970) (appointing *amicus curiae* to provide Court with adversarial briefing); *Bank of Del. v. Buckson*, 255 A.2d 710, 712 n.3 (Del. Ch. 1969) (same).

The court will benefit from the appointment of an *amicus curiae* who can consult with the SEC regarding the petition. Informed by a consultation with the SEC, the *amicus curiae* will provide an independent view regarding whether the petition should be granted.

### III. CONCLUSION

For the reasons set forth herein, the court will appoint Mark J. Gentile of Richards, Layton & Finger, P.A., to serve as *amicus curiae*. Gentile is a distinguished Delaware corporate practitioner who is knowledgeable in this area. He previously served as the receiver in *Calypso Wireless* and has experience interacting with the SEC on these issues. The court will document the appointment in a separate order.